# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| IN RE ) | |
| ) | Case No. 14-20648-TLM |
| ANTHONY NEIL TUCKER, ) | |
| ) | Chapter 7 |
| Debtor. ) | |
| _____ ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| on behalf of the Social Security ) | |
| Administration, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. No. 14-07023-TLM |
| ) | |
| ANTHONY NEIL TUCKER, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM OF DECISION

On July 28, 2014, Anthony Neil Tucker ("Debtor") filed a voluntary chapter 7 petition.[1]  On October 27, 2014, the United States of America on behalf of the Social Security Administration ("Plaintiff" or, at times, "SSA") timely filed

---

[1] Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title 11 U.S. Code §§ 101–1532, and all rule references are to the Federal Rules of Bankruptcy Procedure. This Court has jurisdiction pursuant to 28 U.S.C. § 1334, and the issue before it is a core matter on which it may enter a final decision. *See* 28 U.S.C. § 157(b)(2)(I).

MEMORANDUM OF DECISION - 1

a complaint initiating this adversary proceeding. Plaintiff seeks a determination that Debtor owes a debt that is nondischargeable under § 523(a)(2)(A).[2] The cause was tried on July 29, 2015, and the matter taken under advisement on September 10 upon completion of written closing arguments. The Court has carefully evaluated all the evidence, and the arguments of the parties. This Decision constitutes the Court's findings and conclusions under Rule 7052.[3]

## BACKGROUND AND FACTS

### A.   Context

The SSA provides social security disability ("SSD") benefits to citizens who have become disabled and unable to work.[4] As a condition for receiving this benefit, recipients must advise the SSA when they regain employment, they have changes in income, or their disability resolves. Those events have impacts on when an individual is entitled to benefits or the amount or duration of benefits. The system depends on the recipient to provide forthright and timely information. The SSA regularly provides information and materials to reinforce the recipient's

---

[2] Plaintiff initially asserted nondischargeability under § 523(a)(2)(B) as well, but abandoned that contention in its closing brief. Adv. Doc. No. 24 at 2.

[3] The underlying chapter 7 case was closed in March 2015, following the chapter 7 trustee's report of no distribution.

[4] Some decisions addressing § 523(a)(2)(A) actions in similar circumstances characterize these as Social Security "disability insurance benefits" or DIB. *See*, *e.g.*, *United States v. Hall (In re Hall)*, 515 B.R. 515 (Bankr. S.D. W. Va. 2014).

MEMORANDUM OF DECISION - 2

obligation to disclose the information. That the SSA does so reflects the lack of an alternative practical method by which it can obtain the detailed information as to all those receiving benefits on a current and ongoing basis. Though it is clear the SSA can receive information from other sources (for example, employers' reporting of FICA wages paid to individuals), that information is not timely and does not provide a reliable means of preventing overpayment. As one court noted: "Otherwise, as happened in this case, there could be a delay between the date the benefits should have ended and the date SSA discovered that the individual returned to work." *United States v. Drummond (In re Drummond)*, 530 B.R. 707, 710 (Bankr. E.D. Ark. 2015).

### B. Debtor's disability, benefits, and work history

Debtor injured his back in 2003. Several months later, he applied for SSD benefits. In applying, Debtor agreed to notify the SSA when he started working and when his condition improved and he could work. Ex. 100 (application). In that application, Debtor states, in part:

> I AGREE TO NOTIFY THE SOCIAL SECURITY ADMINISTRATION OF ALL EVENTS AS EXPLAINED TO ME.
>
> I AGREE TO NOTIFY THE SOCIAL SECURITY ADMINISTRATION:
>
>   – IF MY MEDICAL CONDITION IMPROVES SO THAT I WOULD BE ABLE TO WORK, EVEN THOUGH I HAVE NOT YET RETURNED TO WORK.

MEMORANDUM OF DECISION - 3

> – IF I GO TO WORK WHETHER AS AN EMPLOYEE OR AS A SELF-EMPLOYED PERSON.
>
> – IF I APPLY FOR OR RECEIVE A DECISION ON BENEFITS UNDER ANY WORKERS' COMPENSATION LAW OR PLAN . . . OR OTHER PUBLIC BENEFIT BASED ON DISABILITY.
>
> . . .
>
> THE ABOVE EVENTS MAY AFFECT MY ELIGIBILITY TO DISABILITY BENEFITS AS PROVIDED IN THE SOCIAL SECURITY ACT, AS AMENDED.
>
> . . .
>
> MY REPORTING OBLIGATIONS HAVE BEEN EXPLAINED TO ME.

Ex. 100.

Debtor received a "notice of [SSD] award" in August 2005, Ex. 105, and the disclosure requirements were reinforced in that notice. Debtor also received a pamphlet regarding his disability benefits, and the notice of award advised Debtor that he should read it. Ex. 106 ("What You Need To Know When You Get Social Security Disability Benefits," SSA Pub. No. 05-10153). The pamphlet, like the other materials Debtor received from the SSA, *see*, *e.g.*, Ex. 107 ("Working While Disabled—How We Can Help," SSA Pub. No. 05-10095), emphasized his "rights and responsibilities" in return for receiving the SSD benefits, and explained how working and earnings impacted the right to or amount of SSD benefits.

MEMORANDUM OF DECISION - 4

In discovery, Debtor provided a history of his work following the 2004 injury. Ex. 149. Eliminating an alleged job at Over The Top Flooring from 2006 through 2008—because Debtor admitted he lied about that job (including doing so in his deposition in this litigation)—his work history reflects the following:

| | | |
|---|---|---|
| 6/2008–5/2009 | Unicep Packaging | $12/hour |
| 6/19/2009–2/4/2010 | S&W Capital | $2,500/month |
| 2/2010–2/2011 | Country Inn | $2,000/month |
| 5/29/2011–6/19/2011 | CR England | $150/week |
| 9/3/2011–12/21/2011 | Wes Olsen Trucking | $2,900/month |
| 1/3/2012–2/10/2012 | Wes Olsen Trucking | $21/hour |
| 4/30/2012–3/18/2013 | Wes Olsen Trucking | $21/hour |
| 4/22/2013–12/13/2013 | Wes Olsen Trucking | $21/hour |
| 5/1/2014–2/4/2015 | Wes Olsen Trucking | $21/hour |

Thus, during the period from 2008 to 2012, Debtor was unemployed for a total of about eight months.

Notwithstanding his work history, Debtor did not advise the SSA of changes in employment or income.

In January 2006, the SSA advised Debtor that he was overpaid benefits in the amount of $18,447.00 because the retroactive benefits he was paid for the period February 2004–July 2005 (which were paid upon the August 2005 notice

MEMORANDUM OF DECISION - 5

of award) did not account for workers' compensation payments he received covering the same period. Exs. 109, 116. This notification advised Debtor he was still entitled to ongoing benefits (even though he had been previously overpaid) and explained Debtor's appeal rights and his right to request a waiver of repayment. Correspondence related to a waiver occurred from February 2006 (Ex. 110) through August 2006 (Ex. 112). In August 2006, Debtor submitted a "request for waiver" regarding the overpaid benefits. Ex. 113. That request was eventually granted. Ex. 115 (SSA letter waiving collection).

In June 2010 and again in July 2010, the SSA sent Debtor a work activity report form that he was to fill out and return in order for the SSA to conduct a work review. Debtor did not return the forms. In August 2010, the SSA sought information from Debtor's possible employers, which replied with information suggesting work performed in 2008 and 2009 for Unicep and S&W Capital.[5] In October 2010, the SSA sent a letter to Debtor informing him it believed his disability had ended in October 2008 due to the work he performed. Ex. 117.[6]

---

[5] The SSA identified possible employers through information derived from the employers' records of earnings paid their employees. This information is thus dated rather than contemporaneous. Exs. 130, 135 (inquiries and responses re: 2009–2010).

[6] The SSA continued to pay benefits based on the rationale that, while substantial gainful work had been performed it had by then stopped and benefits would again be proper. *See*, *e.g.*, Ex. 119. This illustrates, and indeed highlights, the lag resulting from a recipient's failure to timely report changes in employment and earnings and, consequently, the overpayment of benefits.

MEMORANDUM OF DECISION - 6

The SSA sent another letter in December 2010 informing Debtor of the decision regarding his 2009 benefits. Ex. 120. This letter also told Debtor that, while prior benefits had been overpaid because Debtor had been working during the relevant period, he would still receive current ongoing benefits because he was not working[7] at the time of the letters. It also analyzed Debtor's "trial work period" and subsequent eligibility. The SSA again reminded Debtor of his obligations to self-report his work status. He provided no information to the SSA in response even though, during 2010, he was working at Country Inn. Ex. 149.

In March 2011, SSA sent another request for a work activity report. Debtor completed this form and returned it in April 2011, disclosing his work at S&W Capital and Country Inn from January 2010 through February 2011, and asserting he was not working in April. Ex. 121. Debtor started working again right after filing this report (*i.e.*, 5/29/11–6/19/11 with CR England, and 9/3/11 and after with Wes Olsen) but did not report that change.

The SSA sent letters regarding proposed decisions on Debtor's benefits in April and July 2011 (Exs. 122, 123 re: ineligibility 6/09–1/11 and overpayment of $23,500.90). In October 2012, the SSA sent a letter questioning entitlement for additional periods including 2/11, 6/11, 10/11 and thereafter. Ex. 124. In November 2012, the SSA sent notice that no benefits were due for those periods.

---

[7] At least so far as the SSA knew given Debtor's lack of reporting.

MEMORANDUM OF DECISION - 7

Ex. 125. The November letter informed Debtor that he would be subsequently notified of the amount of overpayment and, in a December 2012 letter, Debtor was advised that the overpayment of benefits totaled $42,258.30. Ex. 126. As before, Debtor was advised of his right to appeal or request a waiver.

In February 2013, Debtor requested a waiver of the overpaid benefits. Ex. 127. The SSA denied the requested waiver and assessed Debtor the $42,258.30 in overpaid benefits. Exs. 128, 129.

## DISCUSSION AND DISPOSITION

As this Court summarized in *Huskey v. Tolman (In re Tolman)*, 491 B.R. 138 (Bankr. D. Idaho 2013):

> A party seeking to except a debt from discharge under § 523 must prove its case by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991). Generally, "exceptions to discharge are strictly construed against the objecting creditor and in favor of the debtor in order to effectuate the fundamental policy of providing debtors a fresh start." *Spokane Railway Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471, 475 n.5, 00.4 I.B.C.R. 199, 200 (Bankr. D. Idaho 2000) (citing *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992)). While a central purpose of bankruptcy is to allow an honest but unfortunate debtor a fresh start, "a dishonest debtor, on the other hand, will not benefit from his wrongdoing." *Apte v. Japra (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir. 1996) (citing *Grogan v. Garner*, 498 U.S. at 286–87).

491 B.R. at 149. Further:

> To establish a debt is nondischargeable for fraud under § 523(a)(2)(A), Plaintiff must prove five elements by a preponderance of the evidence:
>
> > (1) misrepresentation, fraudulent omission or deceptive

MEMORANDUM OF DECISION - 8

> conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.
>
> *Depue v. Cox (In re Cox)*, 462 B.R. 746, 756 (Bankr. D. Idaho 2011) (quoting *Turtle Rock Meadows Homeowners Ass'n v. Slyman* (*In re Slyman*), 234 F.3d 1081, 1085 (9th Cir. 2000)).
>
> While often an affirmative misrepresentation is involved, it is clear that an action under § 523(a)(2)(A) can also be prosecuted on the basis of a concealment or fraudulent omission of a material fact. [As noted] in *Stennis v. Davis (In re Davis)*, 486 B.R. 182 (Bankr. N.D. Cal. 2013), . . . it is "well recognized that silence, or the concealment of a material fact, can be the basis of a false impression which creates a misrepresentation actionable under § 523(a)(2)(A)." *Id.* at 191 (citing *In re Evans*, 181 B.R. 508, 514–15 (Bankr. S.D. Cal. 1995)). "A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and possessed an intent to deceive." *Id.* (quoting *Haglund v. Daquila (In re Daquila)*, 2011 WL 3300197 (9th Cir. BAP Feb. 28, 2011)). *See also Barnes v. Belice (In re Belice)*, 461 B.R. 564, 580 (9th Cir. BAP 2011); *Mandalay Resort Grp. v. Miller (In re Miller)*, 310 B.R. 185, 196 (Bankr. C.D. Cal. 2004) ("The concealment or omission of material facts that a party has a duty to disclose can support the nondischargeability of a debt on the grounds of actual fraud.").

*Id.* at 150–51 (footnote omitted).

Debtor emphasizes that he has little formal education and did not receive a high school diploma. Even so, his testimony and demeanor before the Court reflected he could and did understand that the SSD benefits were based on his disability, and the amount of benefits and his right to receive them was

MEMORANDUM OF DECISION - 9

conditioned on his accurate and timely reporting of actual work he obtained.[8]  He at times responded to the SSA inquiries, such as with the April 2011 work activity report, but not others.

Debtor also points to the detailed and sometimes hard to understand descriptions of programs the SSA offers, such as the "trial work" program.  But while it is true the information in the pamphlets, letters and forms is occasionally complicated, the fundamental message was clear.  Benefits are provided only to those that need them, and need is based on accurate information about the disability, whether it has been resolved, and the work that a recipient can and does perform.  The brochures and letters may be less than perfect, but they repeatedly make the point that individuals must affirmatively report on their status.

Debtor argues that, based on the documents and alleged but unsubstantiated telephone calls with SSA employees, he believed he could not only work during a "trial work period" but for several subsequent years without impacting his right to benefits.  The position is not credibly advanced.  Such a conclusion is not supported by the information Debtor received from the SSA, even crediting Debtor's lack of substantial formal education.  His position requires the Court to read the information provided to him by the SSA generously in his favor, while

---

[8] The Court has also evaluated Debtor's letters to the SSA in reaching its findings about his understanding.

MEMORANDUM OF DECISION - 10

simultaneously ignoring everything else provided that negated such a construction and which—importantly—repeatedly emphasized Debtor's duty to timely report and notify SSA of changes in his work status. His testimony reflected an ability to read and to understand those obligations.

Debtor also relies on the fact that he filed tax returns for the years in question, disclosing his employment and employment income for the preceding calendar year. However, the SSA materials did not simply tell Debtor he must file tax returns. The materials required Debtor to notify the SSA regarding his employment and work on an ongoing and timely basis.

In examination, Debtor conceded he understood he was obligated to inform the SSA about all his work changes and his reporting obligations were independent of whatever information the SSA might gather from other sources. Thus the arguments about trial work periods and the like go not to the failure to report such work changes—the omissions made—but instead are advanced in the hope that they might "excuse" them. They do not. Debtor obviously could have reported the work changes in a timely way, and inquired about how his benefits would be impacted thereby, whether under a trial work program or otherwise.

As noted in *Tolman*, a failure to disclose material facts can be a fraudulent omission where there was a duty to disclose and an intent to deceive. This principle has been applied in other § 523(a)(2)(A) cases addressing SSA disability

MEMORANDUM OF DECISION - 11

overpayments. *See*, *e.g.*, *Drummond*, 530 B.R. at 709; *Hall*, 515 B.R. at 520; *United States v. Pipkin (In re Pipkin)*, 495 B.R. 878, 880–81 (Bankr. W.D. Ark. 2013).[9] Here, the duty to disclose was made clear to Debtor. And, under all the circumstances and evidence, including weighing credibility and clarity of testimony, the Court finds the intent to deceive established. There was "a pattern of falsity" and a "reckless indifference to or disregard of the truth." *Tolman*, 491 B.R. at 154 (quoting *NWAS Oklahoma, Inc. v. Kraemer (In re Kraemer)*, 2011 WL 3300360 (9th Cir. BAP Apr. 21, 2011)). Debtor's arguments that he was merely confused or "a little negligent"[10] are not persuasive. The preponderating evidence is that Debtor knew he was receiving benefits while not timely and accurately reporting his employment status to the SSA and that employment status would have an impact on his benefits.[11]

The evidence, including the written information from the SSA and the testimony of Christopher Cohoon from the Couer d'Alene, Idaho SSA office, establishes the SSA relies on self-reporting by SSD beneficiaries regarding their employment. This is entirely rational from the point of view of the SSA. The

---

[9] *See also Bullock v. BankChampaign*, N.A., ___ U.S. ___, 133 S.Ct. 1754, 1760 (2013) ("'[f]raud' typically requires a false statement or omission").

[10] *See* Adv. Doc. No. 25 at 4 (Debtor's closing brief).

[11] The Court notes that Debtor's credibility also suffers from the fact that he misrepresented his work for Over The Top Flooring in 2006–2008, even to the extent of including that misinformation in discovery responses he verified and provided in the present litigation.

ability to obtain information from employers directly requires knowledge of where benefit recipients are working. Obtaining it from employment data is not only cumbersome but significantly untimely. Debtor's observation that both the SSA and the IRS are agencies of the United States is far too facile and assumptive to be given weight.[12] And, even if the SSA could obtain and mine data to try to determine whether a given individual was working, that does not negate the clear and unambiguous requirement placed on the individual that, as a condition to receiving disability benefits, he timely advise the SSA about the status of his disability and about ongoing changes in employment.

Plaintiff proved, by a preponderance of the evidence, the required elements of § 523(a)(2)(A). The Court finds that Debtor made fraudulent omissions and engaged in deceptive conduct, with knowledge that he was doing so. There was the requisite intent to deceive, which led to Debtor's receipt of benefits while lacking entitlement to the same. The SSA was shown to have justifiedly relied on Debtor's conduct, and responded, as best it could though after the fact, to the deceptive conduct.

---

[12] Debtor states: "[T]he Plaintiff is the United States of America. Based on it [*sic*] particular position it was able to know, through its relationship with the IRS, the Debtor was doing some work in late 2008–2012." Adv. Doc. No. 25 at 5. In a related comment, he states: "If Debtor really intended to deceive Plaintiff regarding his work status, then he could have easily worked 'under the table.' Debtor always worked 'above table,' reported all of his income to the IRS and timely filed his tax returns." *Id.* The mistake is in confusing a creditor's arguable ability to ferret out fraud with the debtor's failure to disclose material facts in the face of a duty to disclose.

MEMORANDUM OF DECISION - 13

The final factor is proof of damages proximately caused by the fraudulent conduct. The SSA calculates the amount of overpaid benefits to be $42,285.30. Ex. 126. In requesting a "waiver" of these overpaid benefits, Debtor never contested the SSA's calculation, nor the unreported employment discovered by the SSA. Rather, Debtor's request for waiver was based on the arguments that (a) he "believed" he was eligible for 36 months of benefits after completing a 9 month initial period, and (b) he "assumed" that because he was paying taxes and withholdings were being reported by employers, the SSA was aware of his employment status. Ex. 127. These arguments do not impeach or contradict the SSA's calculations of the damages suffered. The balance of arguments made by counsel disagreeing with the calculations were not persuasively advanced.

## CONCLUSION

Plaintiff has established that the $42,258.30 debt was obtained through Debtor's fraudulent conduct and, under § 523(a)(2)(A), the same is nondischargeable. Counsel for Plaintiff shall submit a proposed form of judgment consistent with this Decision.

DATED: October 14, 2015

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 14